May it please the Court, Tim Scott for the Appellant Eric Gonzalez. The first issue that Appellant Gonzalez would like to address is asking this Court to reverse the convictions on Count 1 and 2. And the reason for that is that both share the same premise, and we would respectfully submit the same flawed premise, that there was sufficient evidence to support a conviction for a conspiracy to carry out excessive force. Now to, of course, to find a conspiracy, the gravamen or the key element is an agreement, a criminal agreement, a plan, a meeting of the minds. And it's our view that it's that key element that was missing in this case. Now I know the Court had asked us specifically to discuss the Davis case out of the Fifth Circuit, so let me try to address that case. And it's our view that that case is actually helpful to the Appellants, insofar as it highlights the contrast to what a true conspiracy and a meeting of the mind looks like, or what appropriate evidence to allow that inference looks like, compared to the facts of this case. Factually, the Davis case spanned over several days. It started with a completely separate criminal activity. There was a beating of an in-custody witness. There were repeated threats and admonitions to inmate witnesses, don't cooperate with the authorities or with the investigation, and if you do, there's going to be trouble. One of the inmates did, in fact, cooperate and testified against the jailers. And sure enough, several days later, a group of jailers went down to the cell block and administered a string of beatings to different people that were perceived to have participated in the investigation, even going so far as somebody diverting a video camera. Now, on the facts of that case, perhaps not surprisingly, the Fifth Circuit said, well, yes, there is adequate evidence there to infer an agreement. You can look at the timeline. You can look at this common motive to quell an investigation. You can look at any number of factors to find that meeting of the minds. It's our view that that stands in contrast to what we have here. The government, and I'll start by saying that it's important, I think, looking at the totality as we must, that each of the government's witnesses expressly disavowed there being this kind of meeting of the minds. Now, people did testify, yes, I used excessive force. People testified that it wasn't justified. People testified that they participated in a cover-up. But nobody, even the government's own cooperators who were beholden to tell the truth and had a great deal of motivation to help governments with their case, even those folks said, no, in hindsight, we realized that this was excessive. We didn't go in there with a specific plan to carry this out. It's that plan that is the grabment of the offense, and it's this agreement that cannot be inferred from what, in essence, is a spontaneous act of violence. Can I ask you, because your client is the supervisor, right? Yes, Sergeant Gonzalez. Do you think that the case law supports the notion that kind of the standard for 241 conspiracy liability is different for a supervisor in the sense that if you as the supervisor essentially watch your subordinates engage in what you know to be excessive force and you do not intervene to stop it as you have an obligation to do, that that is at least kind of a tacit agreement that you formed with those people, even if they're not even aware that you're a supervisor? No, Your Honor. I think certainly that that supervisory position is relevant and could give rise to liability for the substantive act under 242, and I think that's what the Reese case held, and it makes sense to draw that distinction because it's a duty-based analysis. If, as a supervisor, you have a duty to stop and that duty comes from protecting the constitutional rights of that person, and you make an individual personal decision, an individual sin of omission, then Reese says you can be held liable for that criminally, and probably, probably properly so. Now, whether you can then take that principle and say that that individual sin of omission is the same thing as an agreement, as a meeting of the minds with other people, I don't think that turns on the position of the supervisor. It doesn't make that omission any less troubling, quite candidly. Why haven't you, why shouldn't, yeah, let me put it in these terms, why shouldn't the law deem you to have formed a tacit agreement with your subordinates to inflict an unlawful beating in that setting? Well, I think you reach the point where, to do that, you start piling inference upon inference, which I think is what the Anderson Supreme Court case said. We need to take special caution not to do that. Well, okay, yeah, I'm sorry, you should finish the general answer, then I have a follow-up on the specifics here. Well, we're here for your questions, Your Honor. I think that when there is the vehicle of personal individual liability for that sin of omission, and if the government felt that they could prove that to a jury and sought that and didn't disavow it the way in that case, that gives them the tools to do that. I think that allowing a sin of omission to prove agreement is simply going too far in what we're allowing in terms of inference. Okay, fair enough. So the specifics here, then. Yeah. It seems to me there are three potential additional pieces of information that take us out of the sin of omission case that you were describing. The first is that your client, if I remember right, radioed for additional officers to come under circumstances where there really could be no justifiable need for that because the victim was, was he handcuffed behind his back? Yes, Your Honor. So he wasn't, I mean, he was already being manhandled, I assume, at that point, and there was nothing other than summoning the other officers couldn't have, there was no other purpose for that other than to inflict a more severe beating, or at least a jury could reasonably infer, so that's one. Number two, I know you dispute this, but he does state in his report, and I think a reasonable to use force. So that would be two. And then number three, of course, is the post beating conspiracy to cover it up. And I think our cases suggest that that can't be alone enough to support the, you know, the excessive force conspiracy, but it supported that. So those three pieces seem to me to be pretty much to take us well outside the sin of omission case you described. So what's your response there? Well, acknowledging that we have to take it as a totality, let me nevertheless try to address each one in turn, and that's not to divide and conquer, but just to answer it in an orderly way. In terms of the call for backup, the way that the evidence came out was that this was a 415 disturbance call. What does that stand for? I guess 415 under the California Penal Code is simply disturbing the peace. So it's a shorthand for there's a disturbance, basically, there's a disturbance in the front lobby. I think that that piece of evidence is, cuts both ways, and also is one of those damned if you do, damned if you don't scenarios. And let me explain what I mean by that. The way the evidence came out was that this was a general, there's a disturbance in the front lobby call, and I'm paraphrasing, but that went out to anybody who held a handheld radio in the entire structure of the Twin Towers. So it seems a little curious if the argument is this is a group of a couple bad apples who agreed to administer this beating, to then send sort of an all hands on deck to literally anyone that had a radio from a staff person up to senior management presumably within the Twin Towers. It just doesn't seem to move the ball in terms of this evincing an agreement so much as it just being this is operating procedure for when there is a disturbance of whatever stripe. Now when I said damned if you do, damned if you don't, what I mean by that is you could envision a situation where if it is standard procedure for a lawful altercation or a situation of this manner to call a 415 and to call for backup. And if as a supervisor he failed to do that, well then I suppose the argument would be, well see he's trying to cloister this area and keep any other witnesses away and shroud it in secrecy. So I don't know that that moves the ball. Okay. Remind me then, maybe I don't have the facts clear. I thought that at the time he radioed for the other officers to come that basically an unlawful beating was already in progress and that there was no need for additional officers to come to the scene to get it under control in other words. So why couldn't a reasonable jury infer from that that your client's intent was very much to have the additional officers come in and as I said, basically help inflict a more severe unlawful beating? So I guess what I would go back to is, is that evidence of his personal substantive liability, perhaps eating at a bedding or something of that nature, perhaps is it the same thing as saying that in that moment he had formed this plan in agreement with the other officers? I think we just fall back on the argument that that doesn't carry the day in terms of evidentiary value. I guess the court alluded to using his own report. The response to that, as we said in our briefs, is that that's just simply not true. It was the government's premise that the reports were not true. And not in full, but many details in the reports were accurate. Well, but the salient facts were whether he specifically ordered a lawful escalation. I think that the purpose of the falsification of the reports, of course, was to justify the use of force that was inflicted. And that was what the government alleged was false, not anything else. Well, except that every percipient witness who was there was unanimous that no force at all. I agree. And you're right that certainly the the other evidence doesn't support what was stated in the in the in your client's report. But what I'm asking is, is this a sufficiency challenge? It's a pretty deferential standard of review. Why can't that why couldn't a reasonable jury nonetheless decide, look, the man said it. He admitted it in the report. Yes, we found all these other components of it false. But as to that, we don't have any reason to disbelieve him on that. Well, I think it's because we're arguing with the way that the government argued it. It's it's not that did he said it or did he say it? It's was it true? I mean, was it the truth? The government argued that the jury should believe that portion of the report. Right. Even though the government knew based on every witness that testified, including its own plea agreement with the cooperator. No, no. Yeah. OK, well, that's he was that man was stating what, you know, in terms of whether he was directed, but he wasn't speaking for your client's directions to every other officer on the scene. So that goes to your prosecutorial misconduct. I just don't buy that, frankly. So, OK, and then what about the post beating cover up? Why isn't that, again, supportive of the notion that you all really did get together on this? I'd love to answer that question. I'm hesitant about stealing time from my I'm going to ensure that your that your co-counsel get adequate time. OK, very good. Well, let me answer the question. And the the cover up, which, frankly, we don't particularly contest. We think there is sufficient evidence for that. It kind of begs the question in terms of whether there was an initial agreement in that split second. Now, it's because the matrix of facts is not truly in dispute. And as the court pointed out, this was certainly a moral failing, if not potentially giving rise to criminal liability under 242 for Sergeant Gonzalez not to intervene. Really, all the cover up helps prove is that there was something that happened that shouldn't have happened. And whether he's trying to protect his officers, whether he's trying to protect himself from civil or other liability, again, it sort of begs the question as to whether there was in that split second or those moments when this was escalating into a beating, whether there was an agreement or a meeting of the minds to do so. Now, if it's a Davis case or a case where there's this timeline that unfolds and then you can look at who was actually involved in it or if there's a undisputed conspiracy. And the question is, is there sufficient evidence to put defendant A or defendant B within that acknowledged conspiracy? Then we can look at things like that, like like a cover up and whether that ties into the conspiracy. But I think, again, on the fact of this case, it doesn't it doesn't move the ball. So with that, thank you very much, Ron. Thank you, Mr. Scott. Good morning, your honors, I'm Jonathan Edelstein, I represent the defendant, the Pellin Susi Ayala. With the court's permission, I would like to request two minutes for rebuttal. Your honor, with regard to the colloquy on juror number two, I would submit there is a common denominator in the case law, both in cited in our briefs and in the government's briefs regarding what should happen when a juror calls her own impartiality in the question. The court should engage in a colloquy that follows the juror's lead. Let the him or her explain, ask questions to clarify or probe, but don't push the and ultimately accept the juror's decision. Now, this court in Gonzalez held that any doubt must be resolved against the juror, which makes it critical for the court's colloquy to question the juror in a way that eliminates doubt rather than creates doubt. And that the only way to ensure that the juror's ultimate answer, yes, I can be in words that the court put into the juror's mouth, is to accept to follow the juror's lead on this. And the Daly case, which is cited in the government's brief and which is discussed in further detail in my reply brief, I would submit is an example of what to do. That the court in Daly in a block quoted colloquy asked open ended questions of the the juror's own and did not engage in any monologues or lectures. And this case is the exact opposite of Daly. Well, could I ask you, you've chosen Daly to focus on, and I guess I choose Bashur to focus on because it seems to me that case is much closer in terms of being on point factually to ours. And maybe you could help me see why that case is distinguishable rather than Daly. What happened in Bashur was that the juror's change of mind occurred even before the court intervened. The defense counsel questioned this juror, Pettigrew, and said, well, she can't give a positive assurance. Then the prosecutor questions her and she says, oh, yes, I can be fair. And then the court intervenes and says, well, how come you gave two different answers? And Ms. Pettigrew stated, well, the defense attorney asked me about emotions and the prosecutor is asking me about facts. So it was the juror herself that drew this distinction. There was no pushing of the juror by the court. That's the exact same thing that happened here. Exact same thing. Well, no, but no, it's not. I would submit it is not the exact same thing that happened here because here the court did not give that answer on her own. It was not her. She that's exactly what happened. She said, I can't remember the exact sequence, but it was basically you're telling us that you have some issues here. Are you able to put that aside? And she says cognitively, yes, emotionally now or something to that effect. Right. Yes. But then after the colloquies continued, she continued to give equivocal answers. You know, her next answer after that, after the following colloquy was I'll listen to the evidence, which is not. Yes, I can be impartial or even I think I can be impartial. So she was continuing to give equivocal answers even after this took place. Do the cases pardon me to the cases that are referred to by my colleague, are they during voir dire? I'm for sure. Daly Bashor was during voir dire. I believe this case is not during voir dire, though. Right. It's not during voir dire. Seems to me that's pretty fundamentally different. And the reason I'm suspecting that's true is that, you know, lawyers put things put things with shock value before juries all the time. And then the other side has to say, oh, no, you we object because it's it's unduly prejudicial or whatever. And it's an evidentiary matter. We don't normally go and say, well, once something is actually permitted to be admitted like this picture, that then if the juror is shocked, that it's somehow a problem. That's the difficulty I'm having in this case. Does that make sense? Your Honor, I would submit that what happened here goes well beyond shock. What happened, whatever it is, if it was properly admitted, then it's part of what the jury box, it's not prior bias, it's not prejudice, it's just the reaction that this person has to the evidence. If the evidence is unduly shocking, then it maybe it shouldn't have been admitted. But if it's properly admitted, then you get a shocked juror. Well, this this first of all, this video was displayed during opening statements. I thought I thought this was I thought this was a photograph. It was a video, Your Honor. Well, I don't know. I looked at it. None of your co-counsel referred to it as a video. And I read all the briefs. Possibly it was a still from a video. It's a still photograph of a beat up. But even regardless of whether it was a video or photograph, it came in during during evidence. Right. She said I saw this in evidence. In effect, she said she saw it and the way she saw it was because it was introduced in evidence. Is that correct? That is not correct, Judge. It was shown during opening statements. No. OK. It wasn't shown during voir dire. No, not during voir dire. So it was shown during the trial. So she's shocked by something or upset by something that's in the trial. Once the jurors, I don't understand the sequence. It seems like once the jury is determined to be a jury that's been vetted for bias, then if something happens that that that they react extremely negatively, that's that's the way cases are tried. Unless the evidence is improperly submitted or if it shouldn't have been mentioned in the opening of opinion, then somebody should have objected to it and they should have been instructed not to think about it or whatever discipline or have a mistrial. I don't know. But it seems to me like if it's if it's part of what the trial presents to the juror to say that then when the juror reacts to that, the juror should be then examined to see whether the juror is still OK to to hear the case seems unusual. Judge, if I may answer that, and I'm almost out of time, so I would request the court's indulgence for me to give a detailed answer, is that what happened here is that the juror vetted herself, that the she stayed up all night, she wrote a note to the court. She said, you know, as a principal of K-8 students, she explained at length her affected her under her personal philosophy and that this is what she described as a grotesque image is weighing heavy in my heart. And, you know, I think we're familiar with the facts, but what I'm submitting here is that for, you know, this is not only shock that she expressed, she put into question her own impartiality. She put into question the issue of whether based on this one picture, she could then judge the totality of the evidence fairly. And I would submit probably the Tracy versus Palmatier case, which is, I would submit really the closest that either side could find to these sort of facts, a juror that expressed a similar reaction to a similar, you know, to the first day of trial was excused without question. It wasn't even the excusal wasn't even appealed. So I would submit, no, this is not an evidence. How is that precedent then? That doesn't support you, does it? Well, it's no, it's not controlling precedent, but I would submit that it's persuasive that this sort of thing can and has resulted in excusal of jurors. And that certainly for a court to respond to a juror questioning her own personality by ultimately saying, you're breaking your oath. You can't just curl up in a ball and stay in our rooms. That that's the sort of belittling and pushing for an answer that was not done in Daly or in Beshore or in any case where this sort of issue cropped up post-war, dear. And it is the very opposite of how this situation should be resolved. I'm two minutes over my time. I will allow time for rebuttal. Good morning. My name is Katie Kimball Windsor and I represent the appellant, Fernando Lubiano. And Mr. Lubiano is the deputy who did not normally work in the visiting center, but was called in that day because they were shorthanded and he was not charged in the conspiracy count. He was charged in the substantive 242 count as well as the 1519 count. Mr. Lubiano's most important claim is the juror one that Mr. Edelstein has just addressed. But he also raised an issue of first impression as to Section 1519. So that was what I would like to address. I just also wanted to mention that the juror issue has really two parts that in addition to her coming forward after opening statement to say that she was so disturbed that she wasn't sure she could be fair. But later on, it was observed by all the parties that she wasn't looking at the evidence. And that's when the video came up. I think the first issue was with the still photo, but then the parties, including the government, noticed that she wasn't looking at the video and everyone agreed that she should be questioned about that. But the district court chose not to ask any additional questions. So that's the second part of of that claim that I just wanted to clarify. Are you going to turn to 1519? I'm going to turn to 1519. Can you just crisply state at the outset, what is your position on what the Do you mean with regard to the intent element or to just the whole thing? Just lay out in one case, because I got confused between what you said and I think it was someone, whoever addressed 1519, between what was said in the opening versus the reply and the 28-J. So it's a three-part claim. And the first part is really sort of the big overview that in Yates, the Supreme Court said, we should construe this statute narrowly. This was part of the Sarbanes-Oxley Act, and it's really designed to deal with government shredding. And so, you know, of course, Yates was looking at a different word, but that's just sort of the overview of where we are. I just want to make sure I got it straight. So first position out of the box, it should be limited to financial tech documents. Exactly. And so police reports are never going to be covered. Police reports are not covered. OK. But then the second. Yeah. So if we weren't sure, if obviously, if we accept that, you're home free. So if we don't, then what's the next? So the next part is to say, let's, you know, what the Yates court said was you have to really look at the language here and do a close reading of the statute. And when you look at the statutory language, the plain language of the statute refers to alterations of existing documents. And that's not what occurred here. These were narrative reports. Fabrication, doesn't it? Well, so the fabricate an existing document, isn't it? Well, the language of the statute is to falsify or to make a false entry in and falsify the dictionary definition. The first dictionary definition. Fabrication is not in there. Fabrication is not one of the words that's used. It's falsify or make a false entry in. And it's pretty clear make a false entry in was not the language that the government was primarily relying on. They were really using the falsification language. How does that apply to existing documents? Well, that when you look at the definition, first looking at the definition, that that doesn't exist. Why is it? The first definition is that it's generally tampering with something, with some sort of data. Could be. But why would it be limited to that? Well, so that comes to the second part of what the Yates Court says to do. The Yates Court says, first, you look at the dictionary definition, the badness in control. You look at the word that's used in the context of the other words. And so all of those other words that are used are, you know, alter, destroy. They're all things that are done to existing documents. And we know that Congress knows how to how to criminalize false statements in police reports. I mean, if you look at Section 1001, that prohibits making a false writing, knowing the same to contain any materially false statement. So that fits with with police reports, with a false statement in a police report. But that when you look at at this language, the word, the verb falsify and make a false entry and in the context of the other words that are used in the statute, that this is not a good fit writing a narrative report. So if we wrote it, if we wrote an opinion in this way, what would we say? You would be saying that that looking at the statute, that this statute does not criminalize writing narrative false statements that are in narrative police reports because of the starting with the dictionary definition of those terms and then looking at the the terms in the context of the other one. Your position is that the statute can only apply when there's already an existing document and you do something to it to make it false. Exactly. Exactly. And really, I think the only other court that's looked at this, this issue post-Yates is that Second Circuit and Roland. And they really focused on that, the word alter, that they felt like if we read it that way, then alter becomes superfluous. And we responded to that in the brief. And our position is that alter is really a different word. You could actually make a correction, for example, if, let's say, there was a document that had errors in it and you knew you were going to be audited and you wanted to go back and correct those, you'd be altering it, but not falsifying it. So that so that analysis we would submit is not persuasive. Judge Rogers referenced the fabrication. That's the term that's used in the Senate report or there's some legislative history. What do you make of that? You should just ignore it. Or does it shed light on what Congress might have meant by falsify in this context? I mean, I knew that that in the Yates dissent, that there was a lot of talk about how there was really broad language in the, you know, in the this statute was intended to broaden liability. But the and I know Yates is a confusing case because there's this plurality and concurrence, but that they really said there, we need to look at the precise language that was used and construe it narrowly. And that language fabricated is not in the statute. Right. But I'm one of those judges who thinks legislative history sometimes can be helpful. And I guess the word fabrication does suggest the wholesale creation of a falsified document. So why wouldn't we perhaps rely on that to shed light on what falsify means, given that it's somewhat ambiguous, according to you? Right. Well, I mean, I would just say that that wasn't the link, the word that that Congress chose to use. And that, again, there are lots of false statement statutes where the Congress did know how to to to criminalize the writing of fabrication of, you know, narrative reports. OK, so what's your third? So the third argument goes to intent. And I apologize. I feel like I did not. It was not the model of clarity, my initial argument. So let me just state that at the outset. But and it's partly because it is somewhat complex, but the defendants never claimed that the appellants had to know that that investigations into civil rights violations are federal, that that knowledge. Yeah. State crisply, what is it that you say on this element the government has to prove? The government has to prove intent to impede, obstruct or influence an actual or contemplated investigation of a federal matter. Now, I'm saying they don't have to have known that it was federal, but the government has to prove that the investigation that they were obstructing was indeed federal. OK, so let me stop you there. And so why tell me where I'm going wrong? I say these folks use excessive force. They know that. Presumably, they know that that the federal government could prosecute them if they acted under, you know, under color of law. Why wouldn't any report that attempts to cover that up necessarily impeding a potential investigation, not one that's underway at the moment, but a potential investigation that they don't and you're saying they don't need to know that it's potentially federal. So why wouldn't all of those contemplated investigations necessarily fall under the federal umbrella? That's a great question. And so so essentially what we're what we're saying here is that it's that word presumably that you use that the Supreme Court and then the Ninth Circuit, the Supreme Court in Fowler and then the Ninth Circuit in Johnson has said that there has to be something more than sort of a hypothetical. And it's probably the government probably doesn't have to present much evidence on this, but they have to present something. They have to show that there was, you know, that the the federal government had investigated use of force claims before or that there was training that use of force claims or the use of force could violate someone's constitutional rights. There has to be something that shows that that a federal investigation would have ever happened. And there's just that's not too far fetched in the Los Angeles Police Department does not have a good track record on this. Well, interestingly, in the in the in the jails, I think at this point, you know, I mean, you know, we have read the newspapers are aware that there was this later federal investigation. The Rodney King matter has been well known. And those were dual prosecutions that was followed by a federal civil rights action similar to the one here. I mean, if this is not beyond that, this is not beyond the ordinary knowledge of of police officers and maybe and quite frankly, U.S. citizens generally. The way I would respond to that is to look at this court's decision in Johnson, which is as you know, it was looking at this at Section 12. So it's a different statute, but it's in the same obstruction of justice series of statutes. And what it says there is the government has to just present something about that the use of force was investigated by federal authorities or that the you know, that there was some kind of training. There just has to be some evidence of it. Aren't the statutes materially different? Well, those I mean, when those statutes are set up in a very similar way and the one of them there is 1512, which refers to communicating information to federal officers. Is that wrong? That's correct. It's the federal witness tampering statute. When I look at these, these statutes are all set up very similarly. And in fact, they may be set up similarly, but they say different things, don't they? But when you look at the Supreme Court's rationale for why they read it this way, the word that they that that the Supreme Court points to in Fowler is that in the witness tampering, it's the word is prevent, which suggests that you're trying to prevent something. Here, the word is obstruct, which has a similar issue. It also says impede. It also says influence to influence the investigation. That could be to that is to deter the investigation. That would be influencing an investigation. If you tried to deter it, you tried to forestall it or prevent it. But it's still the same the same issue that well, that there's something to impede or to effect. And that's right. If if if if if if all of these officers have got together and said, well, we've got to be honest, let's just file the reports and just tell them that we beat the crud out of this guy. Somebody is going to say, you know, not only are we going to get fired, but we're going to end up with a 1983 suit and we're probably going to end up with the feds over here investigating this as well. That's just not that's just not an unlikely scenario. Right. These folks know well enough. My response to that would be that that does not appear to be what these reports were directed toward. When you look at these reports and they're in the excerpts of record and at Mr. Lubiano's, I think it's volume two starting at page around page forty two, they were looking at a state prosecution of Mr. Carrillo. They let they list violations of California penal code. Sure. No evidence. But it was but if they told the truth, they knew that it wouldn't be Mr. Carrillo's name on the line. It would have been their own names on the line. Well, what what the Supreme Court in the Ninth Circuit said was it has to be something there has to be some evidence that's more than hypothetical, more than than remote or outlandish or simply hypothetical. And we don't have any evidence here that they were acting with an eye toward a federal investigation. What if they were acting towards a state investigation and independently, the court could conclude that that the same thing that they were worried about could have been the subject of a federal. But these people, they just never think about the federal government. They just think about state government. Why wouldn't that be enough? It's just a jurisdictional hook, isn't it? Well, what you're I mean, it's absolutely true that the government there could have been a dual purpose, but there was no I'm asking about the nature of the statute. The nature of the statute seems to say they were trying to forfend an investigation into a particular kind of conduct, period. And second, that conduct is subject to a federal investigation. We know from what we know from what the feds investigate so that you've got the intent, which just goes to avoiding an investigation that might get them in trouble, maybe thinking only of the states, but there's a jurisdictional hook that says and the things should be. But that's the way the language of the statute looks, isn't it? Well, I would just say to look back at the Supreme Court's analysis in Fowler, because Fowler was a different statute. It's a very similar statute. And they say in Fowler as well that this statute is concerned with federal issues. And the second, you know, in addition to that word prevent, the second rationale for that is distinguishable. That's the two statutory languages. I don't have them in parallel right in front of me. But when I did, it looked like they were distinguishable along that very line is that in one of them, it looks like the statute literally says it just has to be something that the feds could investigate. Well, I think I mean, in this case, though, they have to prove that the the investigation that they were trying to obstruct was that federal investigation. That isn't what the statute says, though. That isn't what the statute. Do you have the statute? Yes, I do. It says whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies or makes a false entry in any record, document or tangible object with the intent to impede, obstruct or influence, you know, the not, you know, what does that have to do with investigation or proper administration of any matter within the jurisdiction of any matter, period of any matter. Right. So if you're trying to object and then it goes on to say what? In or in relation to or contemplation of any such matter or case shall be fined under this title in prison, not more than 20 years or both. That's a nearly identical. I have the three statutes laid out together and it really the structure of these three statutes is very similar and they use similar language as well. I think it would be really hard for this court to distinguish 15-19 from 15-12. OK, I'm still unfortunately confused. You started out this prong of your argument by putting on a heading intent. Yes. And so I'm still struggling. You're saying I thought you said that they don't need to know anything about there being a federal investigation. So then how. It's knowledge and intent. So so I'm saying that it wouldn't be a defense for them to say, you know, we wrote these because we were concerned about a 1983 or a federal investigation into use of excessive force. But we thought that those are actually those were state investigations into unlawful use of force. That wouldn't be a defense. It's not a defense that you, you know, made a mistake that you thought that state law enforcement investigated. So let me just see if I got this straight. I'm sorry if I'm torturing you guys. So they need to intend not to falsify something to get Mr. Creel falsely prosecuted. They need to intend to derail some investigation into their own conduct. Exactly. OK, if that's your argument, then what you you start out by saying, well, the government has to put on some evidence that the federal government was investigating this or that at the jail. And what does that have to do with the intent that you just articulated? Well, that they that there has to have been that there has to be some evidence that their intent was to violate that federal matter. And there just there wasn't any evidence that use of force was investigated in the county jails by federal law enforcement or that there was any training into it. So the simple things that that Johnson, you're saying that your client did or your client did have to be thinking about the potential that the federal government would come in to investigate. There has to have been an invest, a federal investigation that they were they were acting with an eye toward and that in this case they were acting with an eye toward that state investigation. They were in the state of the state investigation into Mr. Correa. OK, well, let's just let me just say that one last time. OK, so let's say that they had in their mind and they actually discussed this. The the L.A. Sheriff's Office, Internal Affairs, whoever it is that has authority, they might investigate us and prosecute us under state law for some kind of an unlawful assault. And so that's why we need to falsify these reports. And that's that's the state of the evidence. You say they get acquitted because they didn't have in mind that we want to obstruct this potential federal investigation. That's your position. Well, you know, actually, I mean, in this case, they didn't even have that evidence that the Internal Affairs there was an internal affairs. Question, though, I really want to know the answer to the question. I think they need to have been acting toward the federal investigation and to use the language of the statute would cover what Judge Wofford just described, wouldn't it? No, because that wouldn't be a federal investigation. I thought it was an investigation of a matter which is within the jurisdiction of the federal. So it's a matter. And it happens, jurisdictionally speaking, to be within the jurisdiction of. Of. The federal. Well, that was evidence. I mean, they called the Internal Affairs witness and even he didn't testify that use of force was routinely investigated. There really wasn't much evidence about why these reports were written. Answering Judge Wofford's question. What's the answer to his question? I guess there is evidence that they were forfeiting an investigation based on beating the person up. There is evidence of that, but no evidence that they knew that was subject to a federal. Investigation just happens to be right, I mean, then that was not enough to convict. I think they need to be acting with an eye to it down to a yes or no question. You said that would not be enough. Right. Right. I mean, in my. But my point is that here there's not even evidence of that. There was no evidence of the use of force. So I don't think that question really matters here. Thank you. I think we've taken you well over your time. Yes. Let's hear from the government. A motion honors may please the court, Bram Halden for the United States. The defendants in this case beat up an innocent man and then lied to cover up what they had done. Their convictions to be affirmed. With respect to Gonzales and Ayala's conspiracy conviction, the Fifth Circuit's decision in the United States v. Davis, with which this court cited approvingly in Reif, as well as McQueen, the 11th Circuit decision that the government discusses in its brief, and the five other out-of-circuit decisions that the government mentioned in its 28-J letter, all enumerate factors that this court can look to, and that a reasonable jury can look to, to determine that a conspiratorial agreement was in existence at the time, even if defendants don't actually say, let's go beat someone up, or write out a contract to participate in a conspiracy. Those factors include the factors that Judge Watford mentioned and others that are relevant here. First, motive. That is specifically mentioned in Davis, and it is relevant here. There were at least three motives that would have precipitated this attack on Gabriel Carrillo. First, the defendants knew that Gabriel Carrillo and his girlfriend Griselda Torres had brought cell phones into the jail in violation of jail policy. That supplied one motive for attacking Carrillo. Second, Gonzales and Ayala both heard Carrillo mouthing off by saying that if he were not in handcuffs, he would have fought back before the beating occurred. That provided a second motive, and most frighteningly is the possible motive that the defendants knew that Carrillo's brother had been beaten up by the Sheriff's Department two days earlier, and that Carrillo and his girlfriend may have been bringing cell phones into the jail to get pictures to seem like wild speculation. As the court is aware, after this incident, Gonzales exchanged text messages with a deputy or an officer involved in the abuse of Carrillo's brother, in which he compared the two victims and said, looks like we did a better job. Where's my beer, big homie? To which that deputy responded, ha ha ha. So all of these potential motives are evidence that the jury could have considered in inferring that there was a conspiratorial agreement. Another factor that Davis suggests the court can look at, and that all of the cases that the government has cited in its 28-J letter, suggests the court can look at, is the cover-up after the fact. The fact that the defendants wanted to hide what they had done suggests that what they did was part of a conspiracy to begin with. Another factor that is mentioned in both Davis and in Bigham, one of the cases that the government cites in its 28-J letter, is whether bystanders would reasonably be expected to be present where the incident took place. Here, the incident took place in a windowless employee break room inside of a custody facility where bystanders could not have been present. And moreover, before the beating actually happened, one of the officers in the room suggested that they remove Carrillo's girlfriend Torres from the room, and that is what happened, in fact, in order to presumably remove a witness from what was about to occur. Another factor, as Judge Watford mentioned, is the radioing of additional deputies to the scene. And that is something that both Gonzales and Ayala did. Before the beating even began, Ayala radioed her fellow deputies to a room in which a suspect or a visitor, not even a suspect, was in handcuffs with his hands cuffed behind his back. There was no need for additional officers, and the fact that she did that suggests that she was in on it. During the beating, Gonzales radioed 415, which according to the record tends to suggest in a custody facility that a use-of-force incident is underway, and that's at GER 139 to 40. Can I ask you to go back just to, Ayala is the female deputy. Yes. Her radio call, tell me again about that, was that to a specific person or was it again one of these broadcasts? It was a broad call out for other people to come to the break room before the incident began, and that is when Deputy Luviano responded along with others. So Ayala didn't know that it was going to be Luviano who would show up. She was just broadcasting out to anyone. Correct. And he just happened to be the first one to get there. That is my understanding of the record. The other factors that the court can consider that the 28J cases suggest, as well as some of the, as well as Davis and McQueen, are the failure to intervene. And I think that there is a conflation here between whether the failure to intervene can make one substantively liable for a conviction under Section 242, which is a separate question from whether the failure to intervene can rationally assist the jury in concluding that there was a conspiratorial agreement under Section 241. You would agree that this argument you're making here applies only to Gonzalez, no? No, Your Honor. I think that with respect to the question under 242 of whether Gonzalez could have been substantively liable for his inaction, that may be true that under this Court's Reiss case, the specific defendant in that case was a supervisor and therefore was substantively liable for his inaction. Reiss did not preclude the possibility that other officers, particularly when an individual is in their custody, have a duty to protect that individual. However, that's not the question. Let's say that I'm Ayala and I did not put out the call. I'm just there and I'm trying to get this guy in custody and whatnot. Let's say Gonzalez is the only one who puts out the call. All these officers rush in and they just do exactly what happened here. Ayala never participates. She just stands and watches. I don't understand how a rational jury could infer that she had conspired with the other officers just by her mere presence and inaction to have violated his civil rights. The fact that somebody stands by and watches somebody in their custody or in the custody of their colleagues get beaten to a pulp is something that the court could look to to conclude that that person was in on it, particularly given that she didn't disclose to anyone after the fact that something had gone wrong, that there was a violation of protocol. Rather, she walked out of the room laughing and joking about the possibility that she could fake her own injuries in order to cover up what had happened. So I think it is appropriate for this court to consider her inaction and her participation, her watching, or as she wrote about in her own reports, her potential participation in the incident. Did you all argue at trial that the jury should believe that part of her report, that she actually did participate in part of the beating? I think the government pointed out in its closing that either these defendants, Gonzalez and Ayala, either sat by or, according to their own reports, were involved in the use of force. The government pointed out that there was a photo of blood on Ayala's pants and on her boot. The evidence was introduced that she had gone to seek medical treatment for her supposed injuries and her participating in this incident. So it was entirely rational for the jury to look to that evidence as evidence of the defendant's participation. In fact, that is what the defendants advocated. A couple of times you said, in on it, which to me is sort of ambiguous. In on it could mean prior agreement and in on it could mean that they participated, which you also say sometimes. Participation is not enough for conspiracy, is it? I think I should try to be more explicit in my terms. But I would say you have to have an agreement, right? That's the whole idea. Yes. So the idea is when the person responded to her call, the minute that person walked in the door, there was sort of an instant agreement. Oh, I see. This is one of these awful, very exciting cases that we're going to beat someone up. I'm joining the agreement. Is that the idea? I don't think that the court needs to pinpoint a moment in time when somebody joins. But we have to conceive at least some moment when it might have happened, don't we? Over the course of the incident, the court has to be able to conceive that these defendants were in a tacit agreement to use unreasonable force against the victim. And that can be gleaned from the entirety of the incident itself, which involves not just the beating, but what led up to that. This is an incident in which a man is brought in handcuffs. First, his girlfriend is brought. Then the man is brought in handcuffs into a room. He's pinned up against a refrigerator, face first, with his hands behind his back. Ayala and Gonzalez are there while his hands are raised behind his back, quote, so that he could feel some pain, according to the deputy who exercised that force. They're there when they call people out on that radio, and they're there throughout the beating. The fact that they also, that Ayala herself instigated the report is finally another factor that the court can look to determine that she was in on, and when I use that term, I think in on the agreement, not just the incident, but in on the agreement to beat up this individual. She's agreeing with people. She doesn't even know who they are yet. Once they have entered the room, she knows that her... Once they enter the room, then it becomes an agreement with the people who enter the room pursuant to her or thereafter. I would take the position that she has agreed with the people who are in the room before it starts, or that she is tacitly forming an agreement at that point with those people, and that in addition, the other people enter into the room and join in that agreement, just as one conspirator could be somebody who joins later in. Turning then to... In a way, it's hard to believe they would do what they did unless there was some sort of tacit agreement. I agree with that point completely, Your Honor, and I don't think that Gonzales' counsel's characterization of this as a single or one victim incident makes a difference. The cases that the government said in its 28-J letter, including the Second Circuit's decision in Lopresti and the Sixth Circuit's decision in Lanham, all involved one victim over the course of one evening or one day, and those cases had no trouble concluding that the defendants had entered into a tacit agreement. Of course, the government would reiterate emphatically that this is a sufficiency of the evidence challenge. All the evidence must be viewed in the light most favorable to the government and all inferences drawn in the government's favor. So when opposing counsel points out that there are other possible interpretations of the evidence, all that reveals is that the court must adopt the interpretation of the evidence that is most favorable to the government. The fact that Gonzales and Ayala also argued at trial that their reports were true also supports the idea that the government or the jury was entitled to rely on that as well. Moving then to the juror bias claim, the case law is very clear in this circuit that when a juror unequivocally and unambiguously commits to impartiality, that is enough. And for sure is a case in which actually the circumstances were much more suggestive of bias than here. That juror was the dance instructor for the homicide victim's daughter in the very case that she was going to sit on the jury for. She ultimately never even said unequivocally and unambiguously that she could be impartial. She said, quote, I think I could be fair. So if that was sufficient to find that the district court did not abuse its discretion in refusing to dismiss that juror, the evidence here was certainly sufficient. I think what's troubling about the transcript here and what your opponents have put their weight on is just the somewhat coercive. That's not a fair term, maybe to Judge King, but I think you know what I mean. There's a sense that the jurors, the judge basically took a I'm not going to take no for an answer attitude. And that's what provoked the juror to eventually get around to, yes, the final question. So, Your Honor, if I may. One thing I would like to point out to the court is that his argument in particular, which the defendants have now really placed a lot of their eggs in that basket of the argument that the colloquy was inappropriate, was specifically waived. And if you look at Ayala's excerpts of record, pages 74 to 75, after the entire colloquy took place, the court says, other than that, after making the inquiry, any objection to the court's inquiry itself. Counsel for each defendant. No objection. No, Your Honor. No, Your Honor. No, Your Honor. But the inquiry had already been made and the juror had already given the answer. What were they supposed to say? Go and do it all over again, Your Honor? They could have said what they are saying now, which is that the court's colloquy was inappropriate, that the court's colloquy was somehow coercive. And then what? They could have asked the judge to ask open-ended questions, which they're now asserting the judge had an obligation to do. They could have asked the court to ask additional questions. They could have asked the court to allow them to ask questions. There were possible remedies if they had wanted to litigate this issue. They chose not to. But I think what that really reflects is that what happened below, when the defendants want to manufacture a claim from a cold record, they can suggest that Judge King did something very wrong, when, in fact, at trial, nobody seemed to have an issue with this. And the cold record, what they can glean from it now, I think, is a serious misinterpretation of what Judge King actually did. Were you there? I don't remember if you were trial counsel. I was not there. One of my colleagues in the gallery was there. Okay. I mean, I've appeared before Judge King a bunch of times, and he's an authoritative guy. I mean, the tone that I suspect he used in his colloquy, I can kind of hear ringing in my ears. And I'm not saying that he unfairly coerced the juror, but I understand where they're coming from. You read this transcript. And, you know, the judge was clear the answer that he wanted her to get to, right? And I don't think there's any way you can deny that. So I've appeared before Judge King probably not as many times as Your Honor has. But in my experience, I have found him to be fair, and I found him to be reasonable, and I found him to be thoughtful. And those are the adjectives I would use to describe this colloquy. It was lengthy. That's not a factor that should weigh in favor of finding it was inappropriate. But he expressed empathy. He acknowledged that we're all human beings. He took great pains, I would say, to verify that she was comfortable serving. And, ultimately, she said she was. Do you think there's any difference in the standard between a four-deer and after the case has started? Yes, Your Honor. And I think the standard... What would be the...my intuition suggests that's true, but I'm wondering if it's well-founded. I fully agree with your intuition. In fact, the government took the position in its brief that this is a disguised Rule 403 objection to the evidence. And that is what this is. In any case, a juror, especially one in which there's a serious instance of abuse, it is likely that jurors looking at the evidence are going to be troubled. Okay. I very strongly disagree with you on that. And let me just see if you can persuade me otherwise. Let's say that, in this case, the juror said, after seeing the photo, Your Honor, it doesn't matter what evidence the government puts on, this guy is guilty. And I'm sorry. I came in here with an open mind. But after seeing that, I just...I cannot be fair and just stick to that. I think you would concede that that person must be excused for cause, right? I would concede that. Okay. So it has nothing to do with 403. I mean, the evidence, it was what it was. Even if the juror's reaction to it was irrational, if it was nonetheless sincere and they were saying, I can no longer be fair and impartial in light of this. I'm going to convict no matter what. That person has to go. So the only question, it seems to me, is whether, in fact, the colloquy that led to this juror ultimately saying, I can be fair and impartial was found. And it seems to me that standard is no different from the standard we would use in a four-cause challenge on Bordier, right? I would take the position that the judge at least has some discretion to determine whether the juror's reaction to the evidence is a reasonable reaction that other jurors might have or reflects impartiality or bias. Why does it matter? I don't think the judge gets to decide whether the juror's reaction is reasonable. It might be totally unreasonable. But if the person nonetheless can no longer be fair and impartial, and that is made clear, I don't see how there's any way you could say that a defendant who's convicted by a jury with that person on it got somehow a fair trial. I don't see how you could take that position. If the juror specifically said, I cannot be fair and impartial, that is a juror who has to be struck. No matter what. The reason is, even if it's totally unreasonable, even if it's – I mean, I looked at the picture because I was like, God, what did this picture – I mean, I've got to see this. And I didn't have that reaction. But if a juror did and just said, man, I'm a guilty vote no matter what, it doesn't matter if it's reasonable, unreasonable, rational. That's correct. Okay. But that's not what this juror said. And in the context of a juror expressing concerns or troubled by the evidence or being even very, very troubled or extremely troubled or however the defendants want to characterize this, when the juror does not say that she cannot be fair and impartial, the judge has to exercise his or her discretion to determine whether the juror still can serve fairly and impartially. And here, that exercise of discretion was appropriate. The – one other point I would finally make on that, or two quick points, is that there was no video shown in opening. It was a still image. It was introduced as part of Exhibit 6. And there was no objection to showing that image in the government's opening statement. That's all at GER, pages 2 to 3 and 8 to 9. And then the final point I would make on this issue is that the Tracy case that the defense has relied on now said specifically that the juror in that case, quote, steadfastly maintained that she could not follow the law or be objective. That is the hypothetical, I think, that Judge Watford is introducing. That was not this case. The final issue – two issues, I suppose, that I'll try to touch on briefly, unless the Court has no questions, in which case I see that my time is up. Let's give you two minutes on the 1519. Thank you, Your Honor. As to 1519, Luviano's arguments run into a solid wall of out-of-circuit authority that disagrees with every point that Ms. Kimball Windsor made. The no case holds that there has to be a preexisting document in order to falsify or make a false entry into a record. As Judge Watford pointed out, the legislative history does indicate that fabrication is part of falsification or making a false entry in. The numerous courts have rejected the notion that – and these are all cases that are cited in the governance brief – Rowland in the Second Circuit, Schmeltz in the Sixth Circuit, Hunt in the Eleventh Circuit, that there must be a brand-new document. All of those courts have rejected that idea. What about the intent part of the argument? Respond to that, maybe. So this is a moving target. Can I – tell us what you think the correct interpretation should be, and then you can explain why you think they're wrong. The government must prove – and if I could just look at the stats, actually I have the language here too – an intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States. The government's position is what that means is that the defendant must have an intent to impede, obstruct, or influence an investigation and that that investigation has to fall within the jurisdiction of the United States by happenstance, that that is merely a jurisdictional hook so that the federal government can prosecute. So in every single case in which an officer who has used excessive force or in some other way under color of law violated a person's civil rights, constitutional rights, if that person falsifies a report about that conduct, this statute will always be met in your view? Yes, Your Honor. Okay. And that the – And how is the statute in the – what is it, Fowler? How is that statute different? She says it's very similar and I don't have it right in front of me. So I disagree with the characterization of that as a very similar statute. That statute is entitled tampering with a witness, victim, or an informant and it prohibits specifically intending to prevent the communication by any person to a law enforcement officer or judge of the United States. So what that statute is trying to prohibit is defendants who interfere to prevent information from being given or provided to a federal officer. That is why Fowler and Johnson have said that there must be a reasonable likelihood that the information that the defendants in those sorts of cases impeded or prevented or obstructed would have reached a federal officer. And because Section 1519 includes no such language, this is a different case. It is not an argument that the defendants have litigated. Indeed, Fowler has never been cited prior to the 28J letter and therefore is at most reviewable for plain error. Was there a dispute over the jury instructions with respect to this issue? No. And did the jury instructions track your version of the statute or the requested version of the statute or were they ambiguous therewith? The joint jury instructions, I think, just tracked the party's interpretation of the statute without specifically imposing a federal nexus reasonable likelihood requirement that Fowler and Johnson imposed in the 1512 context. And because this is reviewable at most for plain error, the defendant can't point to any case that has held that that is a requirement in the 1519 context and the government has pointed to one case, the United States v. Gray decision by the 6th Circuit, not to be confused with the United States v. Gray decision from the 2nd Circuit, both of which involve this statute. But the 6th Circuit specifically held that the 1519 statute does not have that reasonable likelihood requirement. With that, Your Honor, the government would close. Thank you. Counsel, we've been very generous to you. I do want to give you an opportunity to offer rebuttal. I'm going to give each of you a minute. You don't have to feel obligated to take it. We've had extensive argument, but I am going to offer each of you time to argue if you'd like. So, Mr. Scott? Your Honor, I would cede my minute to Mr. Scott. Okay. Mr. Evelstein? I would indeed like to take both of my minutes. First of all, addressing the preservation issue the government raised, I would point to page 71 of Ms. Ayala's record excerpts, particularly to the statement of Mr. Smith, who was her counsel, and beginning at the end of line 6, Mr. Smith says, and then the court asked her the final questions, which were quite long and involved, and when she answered yes, she didn't answer affirmatively, just, it's hard, obviously the record's not going to reveal it, but she whispered it almost. It was a whisper, and she said it very tentatively. So, I would submit that at that point on page 71, the conduct of Judge King's colloquy was put in issue. Then on page 74, which is the page that the government referred to, on line 18, the court says, that's why we made inquiry, and that's why the record is what the record is. Other than that, any objection to the court's inquiry itself? So, at that point, the court was soliciting other objections, you know, in addition to the record being what it was. So, I would submit that the statements and issues that were raised in the colloquy were not waived on page 74, and that, moreover, it was affirmatively put in issue on page 71. Second of all, I would, on a Supreme Court case, Arizona v. Washington, which is cited on page 7, footnote 2, of co-defendant Luviano's reply brief, does stand for the proposition that an empaneled juror, during trial, is still subject to challenge for bias, and I would submit that the same result is required by the Ninth Circuit case of Dyer v. Calderon, which is cited in my briefs, and that, in Dyer, the court held that where colorable evidence of bias emerges, the court must conduct an investigation. And there's certainly nothing, I would submit, in either of those cases to suggest that bias means something different after voir dire than during voir dire. So, I would submit that the totality of the colloquy here, and including, you know, such phrases as, can't just curl up in a ball and stay in our rooms, which I would submit, you know, does lean more on the coercive side than the helpful side. You're well over your time. Okay, thank you, Your Honor. Ms. Winter. Thank you. I just wanted to address the standard of review on the intent element. And just to say that the appellants made a Rule 29 motion, and that preserved the sufficiency issue, and this is a sufficiency claim that we're making. Johnson and Fowler actually proposed a lower standard of review than what I was proposing. I was proposing beyond a reasonable doubt, and this is the reasonable likelihood standard is actually lower. I'm surprised that the government isn't happy about that, except that I think that they're proposing that there's just absolutely no burden on this element whatsoever. So I would say that this is just under Pelliari-Scalon, which is a nontrivial case. This is just another argument that we're making in support of the claim that was preserved by the Rule 29 motion. Thank you. I thank all of counsel for the argument. It was very helpful. We appreciate the time that you've devoted to the court today. Thank you very much. With that, the court is in recess until tomorrow.
judges: Rogers, Bybee, Watford